# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

████, a minor, by and through his Guardian Ad Litem, ████,

Plaintiff,

v.

KERN HIGH SCHOOL DISTRICT,

Defendant.

Case No.  1:24-cv-01273-JLT-CDB

**REDACTED** MEMORANDUM DECISION AND ORDER AFFIRMING ADMINISTRATIVE DECISION

CLERK TO ENTER JUDGMENT AND CLOSE THE CASE

**14-DAY DEADLINE**

## I. INTRODUCTION

████, was a 16-year-old high school, special education[1] student in March 2024 and attended ████████, which was one of the schools within the Kern High School District.[2] On ████, the defendant expelled him after an incident in which he made terrorist threats.  (Doc. 1 at 2-3.) ████ challenged the expulsion by filing a due process complaint with the California Office of

---

[1] ████ contends that he is disabled due to his Attention Deficit Hyperactivity Disorder ("ADHD"), Autism Spectrum Disorder ("ASD"), and Disruptive Mood Dysregulation Disorder ("DMDD"), which cause him to struggle in peer relationships, to act without thinking, and to behave inappropriately such as by making empty threats as a way to impress his classmates and to try to connect with them.  (Doc. 1 at 2, 7; see also AR  1001-02); 34 C.F.R. § 300.114(a)); Educ. Code § 56040.1. ████ contends that his additional diagnoses of Oppositional Defiant Disorder ("ODD") and Intermittent Explosive Disorder ("IED") are more accurately diagnosed as ASD.  See Doc. 45 at 6 n.1 citing Administrative Record ("AR") 326-27, 254, 1002-03; 1832.

[2] ████ lived within the boundaries of the Kern High School District, which is a Local Education Agency responsible for providing a Fair and Appropriate Public Education ("FAPE") to students with disabilities who reside within its boundaries.  (Doc. 1 at 16); 20 U.S.C. § 1401(19); 34 C.F.R. § 300.28(a); Educ. Code § 56026.3.

1

1  Administrative Hearings. OAH Case No. 2024060613. The hearing on the due process complaint

2  occurred on an expedited basis, after which, the OAH Administrative Law Judge Tiffany Gilmartin

3  upheld his expulsion.

4    Through his his father and guardian ad litem, ███, ███ brings this action as an appeal from

5  the education due process hearing and pursuant to the the Individuals with Disabilities Education Act

6  ("IDEA"). 20 U.S.C. § 1415(i)(2)(A).[3] (Doc. 1.) ███ seeks review of the OAH decision as to Issue

7  1(b), claiming that on April 4, 2024, the District erroneously determined that his ███████

8  behavior was not a manifestation of his disabilities, and asserting that: (1) the behavior was caused

9  by, or had a direct and substantial relationship to, his disability; or (2) the behavior was a direct result

10  of the District's failure to implement ███'s Individual Education Plan. (Doc. 1 at 19 n. 4; AR 27);

11  34 C.F.R. § 300.530(e).

12    ███ seeks relief including: (1) reversal of ALJ's expedited decision as to Issue 1(b), and an

13  order finding that District violated the IDEA, 20 U.S.C. § 1400 *et seq.*,[4] by failing to determine that

14  ███'s behavior on ███████, was a manifestation of his disabilities, (2) injunctive relief

15  requiring District to cure its IDEA violations,[5] (3) reasonable attorneys' fees and costs incurred for

16  the underlying administrative proceeding and this action, and (4) additional relief as the Court

17  determines appropriate. (Doc. 1 at 20-21, citing 20 U.S.C. § 1415(I)(2)(A); 20 U.S.C. §

18  1415(i)(3)(B).[6]

19    The District contends that the underlying administrative record and expedited decision in OAH

20  Case No. 2024060613 speak for themselves, and the decision is supported by law and fact (Doc. 21

21  at 4) and should be affirmed in full under the IDEA (Doc. 20 at 2). The District seeks as relief that:

22

---

[3] 20 U.S.C. § 1415(i)(2)(A) gives "any party aggrieved by the findings and decision made" in an administrative due process hearing "the right to bring a civil action [for judicial review] . . . in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy."

[4] California's implementation of the IDEA is codified at California Education Code §§ 56000 *et seq*.

[5] ███'s claim for injunctive relief includes: determining that ███'s behavior on ███████, was a manifestation of his disabilities, convening an IEP meeting for ███ regarding his transition back to school, reversing the expulsion, expunging school records regarding discipline and expulsion related to the ███████ incident, returning ███ to his pre-disciplinary placement, and training District staff to comply with the law.

[6] An expedited due process complaint is made pursuant to 34 CFR §§ 300.530 and 300.532 and challenges, *inter alia*, discipline meted out to a disabled student that changes the student's placement. An expedited hearing can also be requested for a manifestation determination that the student's offending conduct was or was not caused by his or her disability. See 34 CFR § 300.530(e). [6]

1   (1) ███ take nothing by way of the federal complaint, (2) the federal complaint be dismissed with

2   prejudice, and (3) the District recovers its attorneys' fees and expenses incurred herein, and such

3   other and further relief as the Court deems just and proper. (Doc. 20 at 7-8.) For the reasons

4   discussed below, the Court **AFFIRMS** the ALJ's decision in full.

5                              **II. FACTUAL BACKGROUND**

6          ███ attended the Panama-Buena Vista Union School District ("P-BVUSD") from

7   kindergarten to eighth grade. In 2018, while ███ was in the fourth grade, he received his initial IEP

8   based in part on his severe social skills needs including struggles with self-control, difficulty working

9   in small groups, and attention seeking behaviors. (Doc. 1 at 7.) In 2019, P-BVUSD transitioned

10  ███ from the IEP to a Rehabilitation Act of 1973 Section 504 disability accommodation plan.[7]

11  Later that same year, a private assessment confirmed ███ met the Diagnostic Statistical Manual

12  criteria for autism. (Doc. 1 at 8.)

13         ███'s social and behavioral symptoms persisted at P-BVUSD. In 2021, while in the eighth

14  grade, ███ was suspended for writing a "hit list" of other students and for making inappropriate

15  comments. P-BVUSD conducted a Manifestation Determination Review ("MDR") hearing and

16  found the behavior was caused by ███'s disability, and that he was again eligible for an IEP, based

17  on Other Health Impairment ("OHI"). At that time, ███ had difficulty with self-control, being

18  impulsive, and making inappropriate comments. (Doc. 1 at 9-12.) The IEP offered individual

19  counseling where ███ would work on "self-management," i.e. his ability to "regulate his emotions,

20  thoughts, and behaviors in the school setting." (Doc. 1 at 12.) During the remainder of ███'s

21  eighth grade year, he was disciplined for making inappropriate comments and noises. P-BVUSD, at

22  this second MDR, found the behaviors were caused by his disabilities, specifically his impulsiveness.

23  (*Id.*) ███'s IEP was amended with new social skill goals and a Behavior Intervention Plan ("BIP")

24  that focused on attention getting verbal aggression and threats. (Doc. 1 at 13.)

25         When ███ matriculated to ███████████ in the fall of 2022, the District continued

26  the IEP implemented by P-BVUSD. (*Id.*) ███ was the subject of three disciplinary MDR's in high

27  school prior to the ███████ incident in his sophomore year. (Doc. 1 at 14.) Though the District

───────────────

28  [7] Section 504, as amended. 29 U.S.C. §§ 794 et. seq.

                                        3

1  found all three of these prior incidents were not caused by, and did not have a direct and substantial

2  relationship to, █████'s disability, the District nonetheless found two of the three prior incidents were

3  manifestations of his disabilities because they resulted from the District's failure to implement

4  █████'s IEP. (*Id.*)

5       On ███████████, just hours prior to the subject incident resulting in expulsion, █████'s IEP

6  team held an annual meeting. The IEP team noted that █████'s behaviors had slightly improved.

7  Still, the IEP team found that █████ needed the IEP and the BIP, which was updated for behavioral

8  incidents including "making threats, sending/showing inappropriate images and statements, and

9  inappropriate use of technology[,]" particularly "when peers are present" and during

10 "unstructured/down time[.]" (Doc. 1 at 15; *see also* AR 618.) █████'s father █████ consented to the

11 March 20, 2024 IEP goals and objectives. (AR 626-28.)

12      Late in the afternoon of ███████████, as junior varsity baseball practice ended, █████, a

13 member of the team, remained in the dugout for clean-up duty pursuant to his BIP. (AR 641-42,

14 1285-86, 1289, 1625-26.) Two other students remained nearby. *Id.* While the baseball coach

15 departed momentarily to gather up nearby clean-up equipment (AR 1286-87), █████ opened the

16 backpack of a student who was on the field running an exercise and removed the other student's cell

17 phone. (Doc. 1 at 16; AR 477, 641-42, 916. 1286, 1478, 1626.) █████ called 911 and identified

18 himself as an 8-year-old active shooter at a different District campus, █████████████████, and

19 stated that he had shot and killed four people. *Id.*

20      The coach returned and dismissed the team. (AR 1289.) █████ ran off in a different direction

21 than he normally went to be picked up. (AR 1291.) Law enforcement responded to both ████████

22 and ███████████████. (AR 1290, 1566-67.) ███████████, which had activities ongoing,

23 went into lockdown. *Id.* █████ was arrested later on the evening of ███████████ for misdemeanor

24 filing of a false police report and then released back to his parents. (AR 927, 1017-18, 1486.) █████

25 was suspended for five days on March 22, 2024, for making a terrorist threat against a school official

26 or school property. (Doc. 45 at 11 citing Educ. Code § 48900.7; AR 630-31.) Then, on June 26,

27 2024, █████ was expelled. (*Id.* citing AR 681.)

28 ///

4

### III. PROCEDURAL HISTORY

On April 4, 2024, District convened an MDR regarding ████'s ████ behavior. (AR 641-58, 1023-34, 1834); 20 U.S.C. § 1415(k)(1)(E); 34 C.F.R. § 300.530. The MDR team was tasked with determining whether ████'s behavior in the incident of ████ was: (1) caused by or directly and substantially related to his disability; or (2) directly caused by District's failure to implement his IEP.[8] *Id.*

District School Psychologist, Kacy McCalla prepared and presented the Manifestation Determination Recommendation. (AR 641-48.) McCalla reviewed ████'s records including the incident report prepared by the District; all the witness statements; ████'s  disciplinary history; ████'s IEP placement and services; ████s transcript and school schedule; parent input; teacher input; IEP provider input; information regarding ████ residing in District databases Synergy and Cyrus; the private evaluation for autism conducted by ████'s outside clinician Dr. Garcia; and P-VBUSD psychoeducational evaluations conducted in 2018 and 2022. (AR 1629-38.)

McCalla concluded that the ████ behavior was not caused by ████'s disability and did not have a direct and substantial relationship to his disability and was not the direct result of the District's failure to implement ████'s IEP. (AR 648.) McCalla found ████'s ████ behavior appeared to be:

> [D]eliberate, as opposed to impulsive, as he retrieved a teammate's cell phone from his bag, dialed 911, then made a false statement that people had been shot at a local high school. He sent text messages to 911 as well. It is this examiner's recommendation that the behavior of "made terroristic threats" was not caused by nor had a direct and substantial relationship to his disability. Per records in Synergy and Siras, [████] was receiving the agreed upon services and supports per his IEP; therefore, it is this examiner's recommendation that the conduct in question was not a direct result of the district's failure to implement the IEP.

(AR 648.)

The MDR team reviewed and discussed McCalla's report. (AR 1636-38.) The MDR team, except ████'s parents, concluded that the ████ behavior was not a manifestation of ████'s disabilities, i.e. that the behavior was not directly and substantially related to ████'s ADHD-

---

[8] The MDR team included ████'s parents, general education teacher Tyus Thompson, case manager Mickey Padilla, school psychologist Kacy McCalla, Assistant Principal Teddy Armijo, program specialist Kelli Wells, mental health clinician Katherine Graves, behaviorist Tamika Henry, and school nurse Carri Rohrbach.  See Doc. 1 at 17.

1  related impulsivity or his social skills deficits, or any failure of the District to implement his IEP.

2  The MDR team, except ████'s parents, agreed with McCalla's recommendation that the ████████

3  ████ behavior resulted from ████s deliberate wrongful conduct in violation of school rules.  (Doc. 1

4  at 17; AR 648, 650, 1505,1569, 1674.)

5      On June 14, 2024, ████ filed with the OAH the noted special education due process expedited

6  complaint in Case Number 2024060613.  (Doc. 1 at 18; AR 1-34.) ████ raised two sets of claims: a

7  first set of expedited claims alleging the April 4, 2024, MDR and ████s expulsion violated IDEA,

8  and a second set of non-expedited claims alleging post-suspension denial of FAPE.  (*Id.*)  The OAH

9  bifurcated the claims and only the first set (expedited claims) went to hearing.[9]  (AR 128-42); *see*

10  *also* 20 U.S.C. § 1415(k)(3)(A)(B); 34 C.F.R. § 300.532(c)(d).

11      The ALJ held the hearing in OAH Case No. 2024060613, by videoconference, on July 9-12,

12  and 15, 2024.  (Doc. 1 at 19; AR 924, 967, 1204, 1446, 1612, 1795) The ALI tried the following

13  Expedited Issues:

14      Issue 1(a): Did Kern High School District fail to conduct an appropriate manifestation
      determination review on April 4, 2024, by failing to review all relevant information in

15      ████'s file.

16      Issue 1(b): Did Kern High School District fail to conduct an appropriate manifestation
      determination review on April 4, 2024, by erroneously determining that ████'s conduct

17      on ████████████, was not a manifestation of his disability.

18  (Doc. 1 at 19.)[10]

19      ████ called 14 witnesses including: ████ and ████'s mother ████, his expert educational and

20  school psychologist Dr. Jason Degtyarev, District school psychologist Kacy McCalla, District mental

21  health clinician Kyla Beed, District school behaviorist Tamika Henry, District mental health clinician

22  Katherine Graves, District JV baseball coach Daniel Ruiz, District dean of ████ Stefanie Bye,

23  District special education case manager Mickey Padilla, District assistant principal Teddy Armijo,

24  District general education teacher Tyus Thompson, District program specialist Kelli Wells, and

25  District psychologist Madonna Linayo.  (AR 1200, 1442, 1609, 1791, 1978.) ████ introduced 44

26  exhibits.  (AR 1971-72.)

27

28  [9] The parties settled the second set of (non-expedited) claims in August 2024.  See Doc. 1 at 18-19.
    [10] Issue 1(a) is not part of the instant appeal.  See Doc. 1 at 19-21.

1    The District called 13 witnesses, including ███'s above witness (except Degtyarev and

2   Linayo), and District Police Officer Elizabeth Erakat.  (AR 1200, 1442, 1609, 1791, 1978.)  The

3   District introduced 40 exhibits.  (AR 691-923.)

4    On July 24, 2024, the ALJ issued her 24-page, expedited decision, upholding the District's

5   April 4, 2024 MDR, finding that ███'s ███████ behavior was not a manifestation of his

6   disability, and denying ███'s requests for relief.  (Doc. 1 at 19; Doc. 1-1 at 1-25; AR 924-50.)  as to

7   Issue 1(b), the ALJ found that the MDR team did not err in finding the ██████████ incident was

8   not a manifestation of ███'s disability. (Doc. 1-1 at 24-25; AR 937-38.)  The ALJ concluded that

9   ███ failed to carry his burden on appeal, and that:

10       The evidence established that the manifestation determination review team considered
        all relevant information in ███'s file. The evidence further established that ███'s
11       conduct on ██████████, was not a manifestation of his disability. Specifically, the
        conduct was not caused by nor had a direct relationship to ADHD or autism. It was also
12       not the result of Kern High's failure to implement his IEP.

13   (AR 946.) This action followed.

14                              **IV.   STANDARDS OF DECISION**

15       This action is brought pursuant to 20 U.S.C. § 1415(i)(2)(A), which provides that a party

16   aggrieved by the findings and decision of a due process hearing conducted by a state educational

17   agency has a right to bring a civil action in either state or district court.  In any such action, the court:

18       **(i)** shall receive the records of the administrative proceedings;

19       **(ii)** shall hear additional evidence at the request of a party; and

20       **(iii)** basing its decision on the preponderance of the evidence, shall grant such relief as
        the court determines is appropriate.

22   20 U.S.C.A. § 1415(i)(2)(C).

23       The court reviews the decision of the hearing officer *de novo,* giving due weight to the hearing

24   officer's judgments regarding education policy.  *See Bd. of Educ. of Hendrick Hudson Central Sch.*

25   *Dist. v. Rowley,* 458 U.S. 176, 206 (1982) ("[T]he provision that a reviewing court base its decision

26   on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their

27   own notions of sound educational policy for those of the school authorities which they review"); *Ojai*

28

*Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1471-72 (9th Cir.1993) (district court's authority under § 1415(e) plainly suggests less deference than is conventional in the review of agency actions); *Adams v. State of Oregon,* 195 F.3d 1141, 1145 (9th Cir.1999) (recognizing that a court should give "due weight to the hearing officer's administrative proceedings"); *N.B. v. Hellgate Elementary Sch. Dist.,* 541 F.3d 1202, 1212 (9th Cir. 2008) (same); *Capistrano Unified Sch. Dist. v. Wartenberg,* 59 F.3d 884, 892 (9th Cir.1995) ("The district court's independent judgment is not controlled by the hearing officer's recommendations, but neither may it be made without due deference" to them because this is what Congress intended in enacting 20 U.S.C. § 1415); *Gregory K. v. Longview Sch. Dist.,* 811 F.2d 1307, 1311 (9th Cir. 1987) ("How much deference to give state educational agencies . . . is a matter for the discretion of the courts"). A court must be particularly deferential to a hearing officer's findings where they are "thorough and careful," *Union Sch. Dist. v. Smith,* 15 F.3d 1519, 1524 (9th Cir. 1994), or where they "are based on credibility determinations of live witness testimony." *J.S. v. Shoreline Sch. Dist.,* 220 F.Supp.2d 1175, 1184 (W.D. Wash. 2002) (citing *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.,* 267 F.3d 877, 887-89 (9th Cir. 2001). "Complete *de novo* review of the administrative proceeding is inappropriate." *Van Duyn v. Baker Sch. Dist. 5J,* 502 F.3d 811, 817 (9th Cir. 2007).

At the administrative hearing, the party seeking relief has the burden of proving that the school district failed to comply with the IDEA. *Schaffer ex rel. Schaffer v. Weast,* 546 U.S. 49, 62 (2005) ("The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief"). On review in district court, the burden of proof is on the party challenging the administrative ruling. *L.M. ex rel. Sam M. v. Capistrano Unified Sch. Dist.,* 556 F.3d 900, 910 (9th Cir. 2009) (citing *Clyde K. v. Puyallup Sch. Dist., No. 3,* 35 F.3d 1396, 1399 (9th Cir. 1994)), *superseded by statute as stated in L.M.,* 556 F.3d at 910, ("In an action for judicial review of an administrative decision, the burden of persuasion rests with the party challenging the ALJ's decision[.]").

"In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies (I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to

1  participate in the decision making process regarding the provision of a free appropriate public

2  education to the parents' child; or (III) caused a deprivation of educational benefits."  20 U.S.C. §

3  1415(f)(3)(E)(ii); *see also R.B., ex rel. F.B. v. Napa Valley Unified School Dist.,* 496 F.3d 932, 937

4  (9th Cir. 2007) (quoting *W.G. v. Bd. of Trustees of Target Range Sch. Dist. No.* 23, 960 F.2d 1479,

5  1484 (9th Cir. 1992)), *superseded by statute as stated in D.O. By and Through Walker v. Escondido*

6  *Union School District*, 59 F.4th 394, 409 (9th Cir. 2023) ("A child is denied a FAPE only when the

7  procedural violation result[s] in the loss of educational opportunity or seriously infringe[s] the

8  parents' opportunity to participate in the IEP formation process.").

9       Review of an administrative record is generally limited to the record before the administrative

10  body. *Wartenberg,* 59 F.3d, at 891.  The district court must affirm if in its independent judgment, a

11  preponderance of the evidence supports the hearing officer's findings and conclusions. *Id.* at 892.

12                    **V.    ANALYSIS**

13       ▇ alleges that the ALJ erred and abused her discretion in deciding Issue 1(b) because her

14  decision was not thorough and careful, that: (1) she ignored significant testimony, including the

15  testimony of ▇'s parents, (2) she ignored significant documentary evidence, including P-

16  BVUSD's assessments and MDR's which found that very similar threats made by ▇ were caused

17  by his disabilities, (3) she relied almost fully on the testimony of two witnesses, Ms. Henry and Ms.

18  Graves, while ignoring that their testimony could not be reconciled with ▇'s educational records,

19  and (4) she did not conduct the hearing and base her decision on the controlling legal standard.  (Doc.

20  1 at 9, 19-20; Doc. 50 at 3-4.)

21       ▇ alleges the ALJ made erroneous credibility determinations, including an adverse

22  determination as to ▇'s expert, Dr. Jason Degtyarev.  (Doc. 1 at 20; Doc. 50 at 9-10.) ▇

23  alleges that the ALJ did not reach conclusions on all the issues raised in his due process complaint,

24  including his allegation within Issue 1(b) that the MDR team failed to consider whether the behavior

25  was caused by disability symptoms other than impulsivity, or was caused by District's failure to

26  implement his BIP.  (*Id.*) The District denies ▇'s allegations.  (Doc. 20 at 4.)

27  **A.    IDEA Statutory Framework**

28       Congress enacted the IDEA "to ensure that all children with disabilities have available to them

9

a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education . . ." 20 U.S.C. § 1400(d)(1)(A); *L.M.,* 556 F.3d, at 909. The IDEA provides federal funds to help state and local agencies educate children with disabilities while conditioning the funds on compliance with specific goals and procedures. 20 U.S.C. § 1412; *Rowley,* 458 U.S., at 179-80 (describing the origin and primary provisions of IDEA); *Hoeft v. Tucson Unified Sch. Dist.,* 967 F.2d 1298, 1300 (9th Cir. 1992) ("Federal funding is conditioned upon state compliance with the IDEA's extensive substantive and procedural requirements.")

A FAPE is defined as "special education and related services that . . . are provided in conformity with the [IEP] required under section 1414(d)" of the IDEA. 20 U.S.C. § 1401(9). "Parents participate along with teachers and school district representatives in the process of determining what constitutes a 'free appropriate education' for each disabled child." *Hoeft,* 967 F.2d, at 1300. The IEP is the "centerpiece" of IDEA's "education delivery system" for children with disabilities. *Honig v. Doe,* 484 U.S. 305, 311 (1988). An IEP is a written statement for each child that is developed, reviewed, and revised annually. 20 U.S.C. § 1414 (d)(1)(A)(i). The IEP must include: (1) a statement of the child's present levels of academic achievement and functional performance, (2) a statement of measurable annual goals, including academic and functional goals, (3) a description of how the child's progress toward meeting the annual goals will be measured, (4) a statement of the special education and related services to be provided to the child, (5) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class, (6) the projected date for the beginning of services and modifications, and (7) the anticipated frequency, location, and duration of the services and modifications. *Id.*

The IDEA provides that where a special education student is suspended for disciplinary reasons for more than ten days, the school district must conduct a manifestation determination to decide whether the conduct at issue was a manifestation of the student's disability. 20 U.S.C. § 1415(k)(1)(E); 34 C.F.R. § 300.536(a)(1). To make this determination, members of the student's IEP team meet to review the student's educational file. 20 U.S.C. § 1415(k)(1)(E)(i); 34 C.F.R. § 300.530(e)(1). The parents, and relevant members of the IEP Team, review all relevant information

in the student's file to determine if: (1) the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability, or (2) the conduct in question was the direct result of the district's failure to implement the student's IEP - if either prong is met, then the student's conduct shall be determined to be a manifestation of the child's disability.  20 U.S.C. § 1415(k)(1)(E)(i)(ii).

The term "relevant information" includes the student's "IEP, any teacher observations, and any relevant information provided by the parents[.]" 20 U.S.C. § 1415(k)(1)(E)(i).  If the review team determines that (1) the conduct in question was caused by, or had a direct and substantial relationship to, the student's disability; or (2) the conduct was the direct result of the district's failure to implement the student's IEP, then the student's conduct "shall be determined to be a manifestation of the child's disability." 20 U.S.C. § 1415(k)(1)(E)(ii); *see also* 34 C.F.R. § 300.530(e)(2); *Doe v. Maher*, 793 F.2d 1470, 1480 n. 8 (9th Cir. 1986) (in a case arising under the Education of All Handicapped Children Act, 20 U.S.C. § 1400(b), a direct and substantial relationship to child's handicap requires the handicap significantly impairs the child's behavioral controls and excludes conduct that bears only an attenuated relationship to the child's handicap).

If the review team determines that the student's conduct was a manifestation of the student's disability, then the district is required to conduct a functional behavioral assessment, implement a new or review an existing behavioral intervention plan, and return the student to the placement from which the student was removed.  20 U.S.C. § 1415(k)(1)(F); 34 C.F.R. § 300.530(f). In contrast, if the review team determines that the student's conduct was not a manifestation of the student's disability, then the district may apply the same disciplinary procedures that apply to children without disabilities.  20 U.S.C. § 1415(k)(1)(C); 34 C.F.R § 300.530(c).

The IDEA further provides that the parent of a student with a disability may appeal the manifestation determination by requesting an administrative due process hearing.  20 U.S.C § 1415(k)(3)(A); 34 C.F.R. § 300.532(a), (c). The ALJ hearing the dispute may order a change in placement of the student or return the student to the placement from which she was removed.  20 U.S.C. § 1415(k)(3)(B)(ii); 34 C.F.R. § 300.532(b)(2).

**B.    ALJ'S Decision Entitled to Substantial Deference**

███ argues the ALJ's decision should not be accorded deference because it is not "thorough

11

and careful," and fails to address all issues or disregards relevant evidence presented at the hearing. (Doc. 45 at 16; *see* section V C, *post*.) As discussed above, the Court is to apply a modified *de novo* standard of review to the appropriateness of a special education placement under the IDEA. *Ashland Sch. Dist. v. Parents of Z.M. R.J.*, 588 F.3d 1004, 1108-09 (9th Cir. 2009). While "less deference than is conventional in the review of agency decisions" is afforded to an IDEA administrative decisions, *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988), "courts must give due weight to judgments of education policy[,]" *Ojai Unified Sch. Dist.*, 4 F.3d at 1472 (quoting *Gregory K.*, 811 F.2d, at 1311). "The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue." *Gregory K.*, 811 F.2d, at 1311 (quoting *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 792 (1st Cir. 1984)), *aff'd*, 471 U.S. 359 (1985). When applying the modified *de novo* standard, the court assigns deference to the administrative decision when it is careful, thorough, impartial, and sensitive to the complexities of the case. *Cnty. Of San Diego v. Cal. Special Educ. Hearing Office* [*San Diego*], 93 F.3d 1458, 1466-67 (9th Cir. 1996); *Ojai*, 4 F.3d, at 1476.

A court may "treat a hearing officer's findings as thorough and careful when the officer participates in the questioning of witnesses and writes a decision containing a complete factual background as well as a discrete analysis supporting the ultimate conclusions." *R.B.*, 496 F.3d, at 942. "After consideration, the court is free to accept or reject the findings in part or in whole." *Gregory K.*, 811 F.2d, at 1311. Though a court has "discretion to reject the administrative findings after carefully considering them, [a court is] not permitted simply to ignore the administrative findings." *San Diego*, 93 F.3d, at 1466. "A court reviews findings of fact for clear error, even if those findings are based on the administrative record." *R.B.*, 496 F.3d, at 937.

Here, the Court finds the ALJ's findings of fact and determinations regarding credibility and weight of evidence to be thorough, careful, impartial, and reliable, and entitled to deference.[11] (*See* Doc. 1-1; section V C, *post*.) The ALJ presided over a hearing lasting five days spread over two weeks. (*Id*.) The administrative record totals nearly 2000 pages. The ALJ actively and fully managed and participated in the hearing, engaging counsel and witnesses, asking questions, and

---

[11] Any findings of fact that are deemed to be conclusions of law are incorporated as such.

1 | ruling on evidentiary issues as they arose.  (*Id.*)  As noted, the ALJ heard testimony from 14

2 | witnesses for ███ and 13 witnesses for District; and admitted and considered 44 exhibits for ███

3 | and 40 exhibits for District.  (AR 621-923, 1971-72.)

4 |      The ALJ issued a reasoned decision spanning 24 pages that cited the appropriate legal

5 | standards, identified burdens of proof, carefully and thoroughly considered and weighed the

6 | evidence, and explained her findings and conclusions with well supported factual findings and

7 | complete, well-reasoned, and thoughtful analysis.  (Doc. 1-1); *see also* 20 U.S.C. § 1400 et. seq.; 34

8 | C.F.R. § 300.1 *et seq.*; Educ. Code, § 56000 *et seq.*; Cal. Code Regs., tit. 5, § 3000 *et seq.*); *see also*

9 | *R.B.*, 496 F.3d, at 942; *cf. M.C. by & through M.N. v. Antelope Valley Union High Sch. Dist.*, 858

10 | F.3d 1189, 1194-95 (9th Cir. 2017) (ALJ not "thorough and careful" where he failed to address all

11 | issues and disregarded some of the evidence presented at the hearing). Therefore, the Court affords

12 | substantial deference to the ALJ's findings and conclusions.[12] In any event, the Court finds the

13 | record preponderates in support of the ALJ's decision on Issue 1(b).  (*See* section V C, *post*.)

14 | **C.    The Record Preponderates in Support of the ALJ's Decision Affirming the District's**

15 | **April 4, 2024 Manifestation Determination**

16 |      ███ argues the ALJ erred in upholding the MDR team's determination on Issue 1(b) that

17 | ███'s ███ behavior was not a manifestation of his disability.  (Doc. 1 at 19-21; Doc. 45

18 | at 6.)

19 |      Under the March 20, 2024 IEP, ███'s disabilities were OHI for ADHD and an outside

20 | diagnosis of ASD.  The noted symptoms of ███'s ADHD were inappropriate verbal statements and

21 | negative comments towards peers, impulsive behaviors in the classroom, and trouble focusing or

22 | remaining on-task.  (*See* section V C 1 a, *post*.)  The noted symptoms of ASD included the inability

23 | to relate socially with others and inappropriate interactions with others. (*Id.*) The record reflects that

24 | ███'s noted alternative diagnoses were best explained by ASD and were considered by the MDR

25 | team and the ALJ on that basis.  (*Id.*)  The Court finds that the ALJ's reasoned decision upholding

26 | the District's MDR properly applies the controlling legal standards and is supported by a

27 |

28 | [12] The ALJ's factual statements in her decision constitute the written findings of fact required by the IDEA and state law. See Doc. 1-1  at 4 citing 20 U.S.C. § 1415(h)(4); Educ. Code, § 56505(e)(5).

preponderance of evidence in the administrative record, as discussed below.[13]

**1.    The ALJ Reasonably Found ██'s ███ Behavior was not Directly and Substantially Related to his Disabilities**

**a.    *Disability-Related Impulsiveness***

██ argues the ALJ erred by upholding the MDR team's finding that his ███ behavior was not directly and substantially related to his disability on the grounds it was not impulsive behavior. (Doc. 45 at 13-17.) According to the Ninth Circuit, such a manifestation is present where the disability "significantly impairs [██'s] behavioral controls" and not where the conduct "bears only an attenuated relationship" to [the ██'s] disability. *Maher*, 793 F.2d, at 1480 n.8.

Here, the Court finds ██ has not carried his burden on appeal. Particularly, the Court finds that a preponderance of the evidence supports the hearing officer's findings and conclusions that ██'s ███ behavior was not caused by or directly and substantially related to his disability-related impulsiveness, as discussed below. *Wartenberg,* 59 F.3d, at 892.

**(1)    ██'s Special Education and Disciplinary History was Before the MDR Team**

██ argues the April 4, 2024 MDR ignored documentary evidence in the record including his prior behaviors and disciplinary incidents, which contradicted the MDR team findings and conclusions that he did not act impulsively on ███. (Doc. 45 at 19.)

The record reflects that the District's school psychologist, Kacy McCalla, prepared a Manifestation Determination Report in the course of which she reviewed ██'s special education and education file including prior diagnosis; grades; P-BVUSD and District IEP, disciplinary and MDR history and documents; a summary of the ███ incident; parental input; teacher input; and provider input. (AR 641-48; *see also* AR 1095-96, 1624-25.) The record further reflects that McCalla did not meet with ██ (*Id*.)

McCalla focused her report on symptoms of disability that ██ historically presented in the

---

[13] The Court finds that ██'s argument on appeal that his procedural rights under IDEA were violated is co-extensive with his substantive arguments. See Doc. 50 at 4.

1  educational setting, i.e. impulsivity, difficulty relating to others socially, difficulty focusing, and

2  inappropriate actions with others.[14]  (*Id.*)  McCalla concluded that the ████████ behavior,

3  which she determined involved a number of steps, demonstrated a deliberate planned behavior rather

4  than an impulsive act.  (AR 1669-75.)

5      The ALJ observed evidence that McCalla's report was thorough and complete and included a

6  review of ███'s academic, behavioral, disciplinary, and IDEA records including IEP, discipline and

7  MDRs.  (Doc. 1-1 at 7-11.)  As noted, the MDR team had before it ███'s IEP, disciplinary, and

8  MDR history at P-BVUSD and at ████    ███'s P-BVUSD IEP's and 504 Plans reflected a

9  history of his disabilities as manifesting in some communication and behavior control symptoms and

10 impulsivity, and social skill needs.  (AR 256-314.)  At age 11 years, ███ received a diagnosis from

11 a private provider, Dr. Garcia, of ASD level 1, mild impairment in social interactions and moderate

12 impairment in restricted and repetitive behaviors, which diagnosis, according to Dr. Garcia,

13 encompassed ███'s ADHD impulsivity and other diagnoses.  (AR 325-26.)  Dr. Garcia observed

14 ███'s high average intellectual functioning.  (AR 327.)

15     As noted, ███ had multiple disciplinary events in P-BVUSD, two of which resulted in

16 MDR's.  ███ had a 504 Plan MDR relating to his creating of a "hit list" of other students, which the

17 MDR team determined to be related to ███'s disabilities.  (AR 350-56.)  ███ then was placed back

18 on an IEP based on a disability eligibility category of OHI, based in turn on his limited alertness

19 adversely affecting his educational performance, off-track behavior, distraction with social

20 interactions, and impulsiveness.  (AR 389.)  ███ was provided with a BIP for aggressive and

21 threatening behavior or sexual statements to peers (AR 437).  ███ had an IEP MDR later in junior-

22 high school relating to inappropriate comments at school, which were found to be disability related.

23 (AR 451-52.)

24     At ████, ███ continued on the IEP and BIP including for disability-related behavior

25 regulation problems and impulsivity, particularly arising when he was unmonitored.  (AR 498-629.)

26 ███ had at least 12 disciplinary referrals at ████ prior to the instant ████ incident.

27 (AR 476-88, 642.)  Three of these prior disciplinary events went to MDR, and involved: threats to

---

[14] ███ concedes that his ADHD is "primarily characterized by impulsivity[.]" Doc. 45 at 6.

1  staff, bringing a lighter to school and starting a fire with it, and bringing a knife to school.  (AR 524-

2  30; 557-71; 573-86.) All of these MDR's were found to involve a series of steps that were planned

3  and thought out and not related to ████'s disability-related impulsivity.  (*Id*.)  Still, two of the three

4  MDR's found ████s behavior was the result of the District's failures to implement ████.'s IEP, and

5  thus a manifestation of his disability.  (AR 524-30; 557-71; 573-86.)

6      The April 4, 2024 MDR team reviewed and discussed McCalla's MDR report regarding the

7  ████████████ behavior. The MDR team members other than ████'s parents, found the ████████

8  ████ behavior was not caused by, or directly and substantially related to ████'s disability.  (AR 650-

9  51.)  The ALJ observed the evidence deomnstrated that the MDR team by and large was familiar

10  with ████'s IEP, disciplinary, and MDR history at ████████████████ even apart from

11  McCalla's MDR report.  (*See* Doc. 1-1 at 11-12; section V C 1 a (2-4), *post*.)

12          **(2)    ████ Could Control his Behavior and not Act Impulsively**

13      ████ argues the MDR team and the ALJ ignored ████'s pre-████████████ MDR's,

14  particularly the two MDR's that occurred while ████ attended P-BVUSD, which he contends found

15  nearly identical threats to be manifestations of his disability - directly contradicting the April 4, 2024

16  MDR which the ALJ upheld.  (Doc. 45 at 13-14; *id*. at 20 citing AR 350-56, 450-51, 524-27, 938.)

17  However, as discussed above, the record demonstrates that McCalla's MDR report considered the P-

18  BVUSD MDR's and the MDR team considered the report. Moreover, ████ fails to demonstrate the

19  P-BVUSD MDR's provide the factual detail and analysis necessary to sustain a finding that they

20  presented threats "nearly identical" to ████'s ████████ behavior.  (AR 350-56, 451-52.) ████

21  has not made any sufficient proffer that the April 4, 2024 MDR determination is inconsistent with or

22  contradicts the P-BVUSD MDR's.  Notably, the ALJ made no finding about the previous MDR's.

23  *(*Doc. 1-1 at 16.)

24      The record otherwise includes sufficient evidence that not all of ████'s behaviors were

25  disability-related, and that the ████████████ behavior was not disability-related.  (*See* section V C

26  1 a 3, *post*); *Maher*, 793 F.2d, at 1470 n. 8. When acting out, ████ did not always act impulsively

27  and without an understanding of the social cues, rules and consequences.  (*See e.g.,* AR 1081-84;

28  1182-83,1521, 1648-49, 1824, 1847-48); *cf. Downey Unified Sch. Dist.*, Case Nos. 2022120336 &

1   2022120719, 123 LRP 6997, *3 (OAH Jan. 23, 2023) (a factually distinguishable case where ALJ

2   Gilmartin found the ▉▉▉'s behavior to be impulsive given the inability to regulate emotions and

3   behavior.)[15]

4         For example, ▉▉▉'s mother ▉▉▉ conceded that over the four years preceding the OAH

5   hearing, ▉▉▉ had demonstrated the ability to control his behavior.  (AR 1081.)  ▉▉▉'s mental health

6   clinician, Kyla Beed, who had worked with ▉▉▉ for approximately 1.5 years, testified that ▉▉▉

7   understood the consequences of his behavior, at times engaged in deliberate inappropriate behavior

8   (AR 1131, 1144), and did so on ▉▉▉▉▉▉ (AR 1136-37), involving "step after step after step."

9   (1165.)  ▉▉▉'s mental health clinician, Ms. Graves, a service provider on ▉▉▉'s IEP and a trusted

10  adult for him, testified that though ▉▉▉'s predominant disability-related symptom is impulsivity,

11  ▉▉▉ still could control his behavior in school (AR 1496-1520); that ▉▉▉ understands when he

12  engages in inappropriate behavior, and does so willingly (AR 1532-33), and did so on ▉▉▉▉▉▉

13  ▉▉▉.  (AR 1533.)  District assistant principal of instruction Teddy Armijo, who attended at least

14  three of ▉▉▉'s prior MDR's, testified that ▉▉▉ understands consequences and is constantly pushing

15  the envelope.  (AR 1563-82.)  ▉▉▉'s baseball coach, Daniel Ruiz, testified that he never observed

16  ▉▉▉ act impulsively.  (AR 1306.)  ▉▉▉'s general education teacher and cross-country coach, Tyus

17  Thompson, testified that ▉▉▉ did not act impulsively (AR 1343-44), and that he had seen ▉▉▉

18  control his behavior (AR 1357).

19       ▉▉▉ appears to concede as much, that his disciplinary and MDR history includes incidents

20  where his behavior was not symptomatic of his disability, where he knew "right from wrong" and did

21  not act impulsively.  (*See* Doc. 45 at 21; AR 524-27, 557-60, 578, 1853.)  Significantly, the March

22  20 2024 IEP reflects that ▉▉▉'s behavior over the preceding several month had been improving,

23  reasonably supporting ▉▉▉'s ability to control behavior.  (AR 625.)  ▉▉▉'s suggestion that his

24  developmental age is much younger than his peers (Doc. 50 at 11) is unsupported by the record and

25  there is not a reason to find otherwise.  (*See* Doc. 50 at 11 citing AR 254, 1898, 1903.)

26       Finally, as to the extent of ▉▉▉'s prior MDR's, which were admitted into the record (AR 349-

27

---

28  [15] The Court grants District's unopposed request for judicial notice.  (Doc. 49-1 at 2; Fed. R. Evid. 201; *E.S. v. Konocti Unified School Dist.*, 2010 WL 4780257, at *3 (N.D. Cal. Nov.  16, 2010).

1  51, 431-55, 528-38, 556-71, 572-86, 729-33) along with witness testimony thereon (AR 1630-35,

2  1641-42, 1649-60, 1759-68), the ALJ reasonably distinguished the prior disability-related behavior,

3  and was not required to make any findings thereon.  (AR 938.)

4              **(3)    The ███████████ Behavior was not Impulsive**

5      ██████ argues his ██████████ behavior was an impulsive prank meant to impress and gain

6  the attention of his peers on the JV baseball team.  (Doc. 1 at 2; Doc. 45 at 9.)  However, the record

7  demonstrates with credible evidence, that ████ acted in a calculated and opportunistic manner on

8  ██████████, and not impulsively.  (AR 641-42, 916, 923, 1286, 1478, 1525-28, 1626, 1669-70);

9  *see also Vasheresse v. Laguna Salada Union School District,* 211 F.Supp.2d 1150, 1157-1158) (N.D.

10  Cal. 2001) (hearing officer did not err by considering the testimony of all witnesses and making a

11  reasonable judgment based thereon and student's educational records).  ██████'s ██████████

12  behavior involved multiple steps interwoven with falsehoods that were thought out, followed by

13  flight from the scene, which was motivated by a fear of being caught.  For example, during the 911

14  call ████ falsely identified himself as another student, an eight-year-old, stated the incident occurred

15  at a different District campus, and departed practice by an unusual route and in a hurry.  (AR 477,

16  641-42, 883, 916. 1286, 1478, 1626.)  As discussed above, ████'s three District MDR's preceding the

17  instant April 4, 2024 MDR found his threatening and inappropriate behavior not to be caused by or

18  directly and substantially related to his disability.  (*See* section V C 1 a (1), *ante.*)

19      The District personnel who were part of the April 4, 2024 MDR team, were well qualified in

20  their respective fields; most had previous familiarity with ████ including his IEP and needs in social

21  skills and attention seeking behavior and lack of boundaries; and those attending the OAH hearing

22  were forthcoming in their testimony.  (*See* generally AR 739-771; 937.)  ████ does not contest the

23  ALJ's finding that five of the eight Kern High members of ████'s April 4, 2024, manifestation

24  determination review team also participated in ████'s November 7, 2023, MDR; and that Tamika

25  Henry, ████'s behaviorist, and Kelli Wells, program specialist, attended all four of ████s ██████

26  MDR's and all of ████'s annual IEP team meetings since ████ matriculated at ████████ during the

27  2022-2023 school year.  (See AR 933, 1581; Docs. 45, 50.)  Nor does ████ contest the ALJ's finding

28  that Katherine Graves, ████'s mental health clinician, attended both ████'s March 20, 2024, IEP

1    team meeting and the April 4, 2024, manifestation determination review.  (AR 934; Docs. 45, 50.)

2    The MDR team members reviewed McCalla's MDR report and recommendation including the

3    relevant records and historical information therein, and then considered the ███'s █████████

4    behavior. As discussed below, the District MDR team members testimony preponderated in support

5    of the MDR team determination.  *Cf. P. by & through Yamin B. v. Bella Mente Montessori Acad*.,

6    2023 WL 4908833, at *2 (S.D. Cal. Aug. 1, 2023), *report and recommendation adopted*, 2023 WL

7    11835242 (S.D. Cal. Aug. 8, 2023) (In context of terrorist threats to commit a school shooting - ALJ

8    found school district's MDR failed to comply with the IDEA where the MDR team relied entirely on

9    the pre-written draft report prepared by the school psychologist - predetermining the outcome); *Jay*

10   *F. v. William S. Hart Union High Sch. Dist*., 2017 WL 6549911, at *7 (C.D. Cal. Aug. 2, 2017),

11   *aff'd*, 772 F. App'x 578 (9th Cir. 2019) (ALJ not through and careful in affirming MDR finding that

12   student's pre-planned threatening behavior was not a manifestation of disability where the MDR

13   team did not review the student's relevant history and lacked data necessary to create and IEP).

14   For example, District behavioral specialist Henry, herself a service provider on ███'s IEP

15   since his enrollment at █████████, testified that ███'s primary disability-related behavior was

16   impulsivity, and that in the months prior ██████████, ███ had shown improvement in this

17   regard.  (AR 1375-1403.)  Henry testified that during her years of classroom observation of ███, she

18   never saw him behave in an impulsive manner.  (AR 1404.)  Henry testified that ███ recognized

19   good and bad behaviors and willfully chose between them.  (AR 1425.)

20   ███'s mental health clinician Graves, a trusted adult for him, testified that ███ exhibited

21   antisocial-type behaviors that were not a function of this disability (AR 1525); and that ███

22   appeared to enjoy making people uncomfortable and upset (*id*.).  Graves testified that ███'s

23   ███ behavior did not have to do with his disability but rather was thought out and opportunistic.

24   (AR 1527.)

25   District program specialist Kelli Wells testified that she attended all of ███'s IEP's; that she

26   did not give deference to McCalla's conclusion regarding the ██████████ incident; and that she

27   independently reached her own conclusion that ███ thought through his behavior on ██████████

28   ███ and was not impulsive.  (AR 1718-43.)  District psychologist Madonna Linayo testified that she

1  had prepared ███'s three prior MDR's for the District, and agreed with the April 4, 2024 MDR

2  team (of which she was not a member) that the multiple steps taken by ███ during the ███████

3  ███ incident were not indicative of impulsive behavior. (AR 1748-84.)

4       The ALJ's reasonably accorded significant weight to the testimony of Henry and Graves, who

5  were established providers for ███ and people he trusted. (AR 941-943.) The ALJ found their

6  testimony credible and clearly reasoned evidence that ███'s ████████ behavior demonstrated

7  a calculated thought out plan—which was intentional and opportunistic—and not impulsive

8  behavior. (*See* AR 1374-1439, 1496-1558; *see also* AR 315-31, 367-91, 437-42, 513-18, 547-52,

9  593-98, 603-28; *cf.* AR 1869-1968.) The ALJ reasonably found the testimony of Graves that ███'s

10  behavior was not expected of someone with autism, and that she had observed ███ engage in anti-

11  social behavior, to be knowledgeable, thoughtful, and consistent with the evidence. (AR 943.)

12       Additionally, the record demonstrates that the external stimuli, which historically had triggered

13  impulsive behaviors in ███ (*e.g.*, peer approval; a lack of structure; a lack of supervision and

14  monitoring), all were absent during the ████████ behavior. For example, the weight of

15  credible evidence in the record supports a finding that none of the JV baseball team members

16  suggested to ███ that he call 911, or were aware ███ was making the 911 call. (AR 880-87.) This

17  evidence on balance also shows that only two players were in or near the dugout at the time of the

18  911 call (AR 1232), and they both were upset by ███'s 911 call (AR 1232).

19       Finally, the ALJ reasonably could reject ███'s suggestion that the persuasive weight of

20  McCalla's MDR report and recommendation was diminished on grounds that: (1) McCalla was not

21  accorded access to ███ prior to the MDR (AR 1624-25; *see also* Doc. 50 at 1505), and (2) McCalla

22  considered the later disproven allegation that ███ texted 911 during his ████████ behavior

23  (AR 159, 648, 916; 1228-30). ███ has not pointed to evidence that he was denied the opportunity to

24  participate in the April 4, 2024 MDR and subsequent OAH hearing. Relatedly, the ALJ reasonably

25  found that:

26       [T]he inclusion of the allegation ███ additionally sent text messages to 911 was not
        fatal. Dean of Student Behavior and Supports at ████████ High School Stefanie Bye
27       clarified the error during testimony. There is no evidence the manifestation determination
        review team relied on the fact text messages were sent to 911 as part of the decision-
28       making process.

20

1  (AR 935).

2  (4)    **Testimony of ███'s Parents ███ and ███**

3        ███ argues the ALJ erred by failing to mention, and by implication failing to consider, his

4  parent's testimony regarding ███'s disability-related symptoms, including anecdotes illustrating his

5  impulsivity and social skills deficits at school and at home.  (Doc. 45 at 13-14, 19.)  Contrary to

6  ███'s argument, the record reflects that his parents spoke at the April 4, 2024 MDR expressing their

7  view that he acted impulsively.  (AR 646; *see also* AR 1356.)  For example, at the OAH proceeding

8  ███s mother, ███, testified to his impulsivity, need for peer approval, and trouble understanding

9  social cues.  (AR 1001-02.)  ███ also testified that ███ indicated to her that he was encouraged to

10 contact 911 by one of the other ███.  (AR 1018.)  ███'s father, ███, testified at the OAH hearing

11 to ███'s general impulsivity and social deficits, and to his view that ███ acted impulsively on

12 ███.  (AR 1801-64.)

13        The Court finds that ███ has not carried his burden of showing the ALJ failed to consider his

14 parents' testimony. The ALJ had the parents' testimony before her and any credibility and weight

15 determinations, express and implicit, based thereon, are entitled to substantial deference, for the

16 reasons stated.  (*See* section V B C, *ante*.)  The ALJ engaged the parents and asked questions –

17 suggesting her consideration of their testimony individually and together was careful and reasonable.

18 (AR 1000-1102, 1177-95, 1801-64.)  ███ has not proffered authority that the ALJ was required to

19 discuss each piece of evidence in the record.  As discussed above, the IDEA framework generally

20 contemplates a hearing officer will "hear, and make a determination regarding," the appeal.  20

21 U.S.C. § 1415(k)(3)(B)(i); 34 C.F.R. § 300.532(b)(1).  The noted record demonstrates that the ALJ

22 did so here.

23        In any event, ███ does not point to testimony by his parents that proves disability-related

24 behavior on ███.  The ALJ reasonably could find ███'s testimony to be speculative,

25 equivocal, based upon generalizations raised by ███'s disability, and not well grounded in the

26 factual record.  (AR 1801-64.) At times, ███ testimony contradicted the facts in the record

27 regarding the 911 call. For example, ███ testified to his understanding, unsupported in the record,

28 that the phone ███ took during the ███ incident was "visible" to ███, and thus an

21

1  external stimulus to impulsive action. (*See* AR 1850-51.)

2  Similarly, the ALJ reasonably could find ████'s testimony regarding ████'s impulsive versus

3  purposeful behavior to be equivocal, not well grounded on the facts of the ███████████ incident,

4  and to an extent supportive of the MDR team's findings that ████ could and did regulate his negative

5  behavior based upon whether he was being supervised and observed and by whom. (AR 1000-1102,

6  1177-95.) Additionally, the ALJ reasonably could find that ████ failed to show his parents were

7  denied the opportunity to participate in the April 4, 2024 MDR. For example, though ████ testified

8  that the April 4, 2024 MDR lasted 30-45 minutes and that only the school psychologist and mental

9  health clinician spoke (AR 1023), later in her testimony ████ acknowledged that she did speak at

10 that MDR team meeting and made a statement about ████'s behavior being impulsive (AR 1032).

11 ████ suggested her hesitance to participate in that MDR team meeting because she felt whatever she

12 might say would not have made a difference. (AR 1088.) ████'s father ████ testified to his

13 participation in the April 4, 2024 MDR, where he advocated that ████ acted impulsively on

14 ████████. (AR 1800-64.) For example, ████ testified that ████'s autism was discussed at the April

15 4, 2024 MDR, in the context of Dr. Garcia's noted opinion that autism best accounted for and

16 subsumed ████'s other diagnoses and symptoms, and ████ joined this discussion. (*Id.*)

17                     **(5)    Testimony of ████'s Expert. Dr. Degtyarev**

18 ████ argues the ALJ improperly discounted and dismissed the testimony of his expert, Dr.

19 Jason Degtyarev, despite Degtyarev's specialized expertise and thorough analysis of ████'s

20 disability. (Doc. 45 at 13-14, 23-25.) ████ points to Degtyarev's "professional expertise and analysis

21 [as] consistent with well-established principles in educational psychology." (*Id.* citing AR 684-86,

22 1018, 1869-76.) ████ points out that Degtyarev interviewed ████, met with ████'s parents, and

23 conducted a comprehensive file review of ████'s records. (Doc. 45 at 23-24 citing AR 635, 642,

24 940, 1018, 1876, 1901.) The ALJ found Degtyarev's testimony to be speculative and unreliable, a

25 "contortionist act of circular testimony and logical fallacies." (Doc. 1-1 at 18-21; *see also* AR 1868-

26 1968.)

27 The Court accords substantial deference to the ALJ weighing of Degtyarev's testimony, for the

28 reasons stated. The Court also finds significant evidence in the record supporting the ALJ's decision

1    to afford Degtyarev's opinions little weight.  For example, though Degtyarev testified to his

2    qualifications as a school and educational psychologist with 19 years of practice experience,

3    Degtyarev demonstrated limited knowledge of ▮▮▮▮ and the April 4, 2024 MDR team meeting and

4    determination. The AJL reasonably questioned Degtyarev's only fleeting familiarity with ▮▮▮ in

5    and out of the classroom, and with the factual record. For example, Degtyarev was not present at the

6    MDR, and interviewed ▮▮▮ for only an hour, and interviewed ▮▮▮'s parents for only an hour and

7    one-half.  (AR 1869-78.) The AJJ also observed Degtyarev's characterization of the BIP's

8    supervision element as requiring ▮▮▮ be "closely monitored at all times," when the BIP required

9    only "supervision and intermittent proximity;" Degtyarev uncorroborated statement that ▮▮▮ was

10   "prompted by his peers" to make the 911 call; and Degtyarev's opinion, ungrounded in authority and

11   the factual record, that ▮▮▮'s 911 call was "silly[.]"  (Doc. 1-1 at 18; AR 1885-86, 1890.)

12        The ALJ reasonably could credit the testimony of ▮▮▮'s trusted adults, Graves and Henry, that

13   the BIP's supervision element required only periodic check-in, such that ▮▮▮ was being supervised

14   by JV base coach Ruiz on ▮▮▮▮▮▮▮▮▮. (*See e.g.*, AR 634-39, 1376-77, 1395-96, 1410, 1467,

15   1499, 1528-29.) The record further reflects that ▮▮▮'s peers did not prompt and/or by their presence

16   or conduct, cause ▮▮▮ impulsively to make the 911 call. (*See e.g.*, AR 634-39, 880-87; *see also*

17   940, 1015-18, 1285-86, 1289, 1481, 1525-26,  1665, 1887, 1903, 1935-37, 1956-58.) ▮▮▮ concedes

18   that "[a]n expert's lack of direct observation of a ▮▮▮ in the school setting can support an ALJ's

19   decision to discount the expert's credibility[.]" (*Id.* citing *N.B.* 541 F.3d, at 1212.) ▮▮▮ makes no

20   showing that Degtyarev observed him in the school setting.

21        Degtyarev's discussion of ▮▮▮'s manifested disability is not well grounded in scientific theory

22   or the factual record. Degtyarev could not recall all the symptoms of ADHD, and did not look at the

23   kinds of symptoms ▮▮▮ presented.  (AR 1893-94.) Though Degtyarev went on to explain that in

24   general ASD and ADHD together raise "brain-based self-regulation" issues that can cause a failure

25   "to register social reactions in the moment[,]" and that the frequency of impulsivity in someone with

26   ASD and ADHD should decrease over time, he did not provide any significant analysis of such

27   matters on the facts of this case.  (AR 1898-1904.)

28        Significantly, in discussing ▮▮▮'s ▮▮▮▮▮ behavior, Degtyarev ignored the absence of

23

1  evidence of external stimuli (peer approval and an unstructured and unmonitored environment),

2  which historically triggered ████'s impulsive behavior.  (AR 1905-28.)  Degtyarev's opinion that

3  even in the absence of such external stimuli, ████ could act impulsively based upon "internal

4  reinforcement" reasonably could be seen by the ALJ as inherently contradictory, speculative, and

5  unsupported by scientific authority and the factual record.   (AR 1933-40.)  The same goes for

6  Degtyarev's further opinions that: (1) ████'s ████████ behavior must have been impulsive

7  because ████ ended up alienating himself from his teammates (AR 1905-28), and (2) the April 4,

8  2024 MDR determination was errant because it differed from ████'s prior MDR's and "disabilities

9  don't disappear like that." (AR 1924.) Degtyarev's apparent suggestion thereby, that all behavior by

10  a disabled ████ is disability-related, is unsupported by authority and runs counter to *Maher*.  *See* 793

11  F.2d, at 1480 n.8.

12        ████'s further argument that the ALJ's reference in her expedited decision to Columbine,

13  Parkland, Uvalde, and Sandy Hook, which were matters not raised at the hearing or otherwise in the

14  record, was inflammatory such to demonstrate the ALJ's bias against Degtyarev, is unpersuasive.

15  (*See* Doc. 45 at 26; Doc. 1-1 at 18.) This bias argument is undeveloped and unsupported in the

16  factual record. Furthermore, the ALJ's comment, viewed in context, was not inappropriate given the

17  noted evidence in the record that ████ could regulate his behavior to make people uncomfortable, as

18  by the instant 911 call. Therefore, the administrative record does not compel the conclusion that the

19  ALJ clearly erred by affording little weight to the testimony of Degtyarev.  *See Amanda J.*, 267 F.3d,

20  at 889.

21                    **b.    *Disability-Related Social Skill Deficits***

22        ████ argues the ALJ erred by upholding the MDR team's determination notwithstanding

23  evidence that his ████████ behavior was a disability-related manifestation of: his social skills

24  deficits (Doc. 45 at 7, 13-18 citing AR 257, 323-24, 605, 715, 1820-21, autism-related challenges

25  including social impairments and a strong desire for peer approval (*id.* citing AR 434-35, 438, 441,

26  516, 610, 1001, 1010, 1700, 1823), difficulty interpreting body language and social cues (*id.* citing

27  AR 303, 316, 326, 406, 1708, 1922, 1943), verbal and nonverbal communication challenges (*id.*

28  citing AR 327, 1001), and struggles with maintaining eye contact and understanding social cues (*id.*).

24

1    Particularly, ████ argues the MDR team ignored his autism-related cognitive rigidity and inability to

2    forecast consequences (Doc. 45 at 10 citing AR 641-48; *see also* Doc. 50 at 6-8), which he contends

3    cause him trouble recognizing when his behaviors offend and push people away—compounded by

4    his acting quickly without thinking. (Doc. 45 at 7 citing AR 348, 471, 504, 543, 718-19, 831, 1164,

5    1172, 1695, 1699). However, the ALJ reasonably could find the MDR team had before it and

6    considered ████'s noted disabilities including ASD, ADHC, and alternative diagnoses encompassed

7    thereby. (*See* section V C 1 a, *ante*.) For example, the ████████ IEP/BIP that was approved

8    just hours before the 911 call included goals for addressing ████'s social, emotional, and behavioral

9    needs. (*Id*.) Furthermore, the ALJ reasonably observed that IDEA speaks to a ████'s disabilities

10   rather than disability related needs. (Doc.1-1 at 14-16.) The record is consistent with this

11   observation. For example, District behavioral specialist Henry testified that the behaviors included

12   in a BIP are not necessarily related to or a function of the IEP disability. (AR 1410.)

13      In any event, the ALJ reasonably found that ████'s ████████ behavior was not a result

14   of his social skill deficits, but it was a deliberate and calculated behavior, for the reasons discussed

15   above. (Doc. 1-1 at 17-21; section V C 1 a, *ante*.) ████s expert Degtyarev conceded that ████'s

16   ASD diagnosis found only mildly impaired social interactions and peer relations, leaving ████ with

17   some ability to read social cues and engage his peers appropriately. (AR 1944.) Degtyarev agreed

18   that ████ has "some control to a degree over his behavior," albeit Degtyarev went on to equivocate

19   that, "I see him as very stimulus bound and typical of ADHD and to a degree autism, and so in that

20   sense there is a lack of control, especially when he's dysregulated emotionally[.]" (AR 1952-53; *see*

21   *also* 1954-56). Therefore, the ALR also reasonably found ████'s disability-related social skill

22   deficits did not cause and were not directly and substantially related to his ████████ behavior.

23      **2.    The ALJ Reasonably Found ████'s ████████ Behavior was not the Direct**

24   **Result of the District's failure to Implement the IEP**

25      ████ alleges in his complaint in this court, that the ALJ erred by upholding the MDR team

26   finding that his ████████ behavior was not the direct result of the District's failure to

27   implement his IEP. (Doc. 1 at 19.) The record reflects the ALJ upheld the MDR team finding that

28   ████'s ████████ conduct was not the direct result of the District's failure to implement his

1   IEP. (Doc. 1-1 at 21-24.) Particularly, the ALJ found that JV baseball coach Ruiz maintained

2   supervision over ▮▮ at the time of the 911 call and that even if he had not, the 911 call was not a

3   behavior the BIP was meant to address. (Doc. 1-1 at 22-24.) ▮▮ has not argued the failure to

4   implement claim on appeal, and concedes the issue, at least implicitly.[16] (*See* Docs. 45, 50.)

5        In any event, the ALJ reasonably could uphold the MDR team's determination that ▮▮ was

6   receiving all agreed upon IEP services at the time of the ▮▮▮▮▮▮ incident (*See* AR 650, 658),

7   and that the ▮▮▮▮▮▮ behavior was not the direct result of the District's failure to implement

8   the IEP (*id*.). For example, JV baseball coach Ruiz had received and was aware of ▮▮'s IEP/BIP

9   prior to the ▮▮▮▮▮ incident (AR 773-82; 1285; *see also* AR 1529), and had implemented

10  requirements thereunder (AR 944-45; 1287). Degtyarev's testimony is not a reason to find otherwise.

11  For example, Degtyarev was unaware the Ruiz had assigned ▮▮ an after-practice job as required by

12  the IEP. (AR 1957.) Degtyarev also mischaracterized the IEP's supervision proximity requirement,

13  as discussed above.[17] (*See* Doc. 1-1 at 22-23; AR 1957-59; section V C 1 a (5), *ante*.)

14  **D.    Attorneys' Fees**

15       ▮▮ seeks an award of prevailing party attorneys' fees pursuant to 20 U.S.C. § 1415(i)(3)(B).

16  (Doc. 1 at 20.) The Court has discretion to award reasonable attorneys' fees in actions brought under

17  IDEA. 20 U.S.C. § 1415(i)(3); 34 C.F.R. § 300.517; Educ. Code § 56346(f). Parents are prevailing

18  parties if they "succeed [ ] on any significant issue in litigation which achieves some of the benefit

19  [they] sought in bringing the suit." *M.C. by & through M.N*, 858 F.3d, at 1201 (citing *Park* v.

20  *Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1034 (9th Cir. 2006)). ▮▮ is not the prevailing

21  party in this appeal and is not entitled to attorneys' fees, for the reasons stated.

22       The District seeks to recover its attorneys' fees incurred herein. (Doc. 20 at 7-8.) The Court

23  has discretion to award reasonable attorney's fees to a prevailing local education agency, but only in

24  circumstances the Court finds are not present here. 20 U.S.C. § 1415(i)(3)(B)((i)(I)(II). The Court

25  does not find that the complaint initiating this action was frivolous, unreasonable, or without

26

27  [16] ▮▮ does argue the District's failure to supervise in proximity, in the context of whether his behavior was caused or related to his disability, as discussed above. See section V C 1, *ante*.

28  [17] Degtyarev later characterized "intermittent proximity" to require "▮▮ has you in sights, knows you're nearby . . . that person is coming in and checking in." AR 1960.

1   foundation, or that it became so during its pendency. *Id*. Nor does the Court find that this action was

2   brought for any improper purpose. *Id*. Consequently, the District is not entitled to attorney's fees, for

3   the reasons stated.

4   **E.    Sealing**

5        The Court is issuing this order under seal.  However, it is not convinced that it should remain

6   sealed. Thus, <u>**within 14 days**</u>, counsel **SHALL** file a joint document setting forth specifics as to why the

7   order should remain sealed and why it cannot be redacted and then be filed on the public docket.  If they

8   agree that redaction is appropriate, they **SHALL** submit a draft copy of this order with the proposed

9   redactions made, along with their joint statement. If they fail to respond within 14 days, the Court will

10  understand that they agree that sealing is not required, and the Court will unseal the order.

11                                **VI. CONCLUSIONS**

12       The district court must affirm the administrative decision if in its independent judgment, a

13  preponderance of the evidence supports the hearing officer's findings and conclusions. In its

14  independent judgment, the Court finds that a preponderance of the evidence in the administrative

15  record supports the ALJ's July 24, 2024 findings and conclusions on appealed Issue 1(b). Thus, the

16  Court **ORDERS:**

17       1.    The ALJ's July 24, 2024 Expedited Decision on appeal is **AFFIRMED in FULL.**

18       2.    ███████'s request for prevailing party attorneys' fees on the administrative appeal is

19  **DENIED**.

20       3.    The District's request for prevailing local education agency attorney's fees incurred

21  herein is **DENIED**.

22       4.    The Clerk is **DIRECTED** to enter judgment in favor of the District and close this case.

23       5.    <u>**Within 14 days**</u>, counsel **SHALL** file a joint statement addressing whether this order

24  should remain sealed. (Headnote E.) If they fail to do so, the Court will unseal this order thereafter.

25

26  IT IS SO ORDERED.

27  Dated:   <u>**August 4, 2025**</u>

28

                                    UNITED STATES DISTRICT JUDGE